United States District Court
Southern District of Texas
**ENTERED**
November 05, 2018
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHAWN MAYREIS, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-17-3753 |
| | § | |
| LORIE DAVIS, DIRECTOR, TEXAS | § | |
| DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, CORRECTIONAL | § | |
| INSTITUTIONS DIVISION, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND RECOMMENDATION GRANTING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this proceeding brought pursuant to 28 U.S.C. § 2254 is Respondent's Motion for Summary Judgment (Document No. 12) against Petitioner's Federal Application for Writ of Habeas Corpus (Document No. 1). Having considered Respondent's Motion for Summary Judgment, Petitioner's Traverse in response (Document No. 18), the claims raised by Petitioner in his § 2254 Application, the state court records, and the applicable law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Respondent's Motion for Summary Judgment (Document No. 12) be GRANTED, that Petitioner's Federal Application for Writ of Habeas Corpus (Document No. 1) be DENIED, and that this case be DISMISSED WITH PREJUDICE.

## I.    **Introduction and Procedural History**

Shawn Mayreis ("Mayreis") is currently incarcerated in Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID), as a result of a 2014 capital murder conviction in the 184th District Court of Harris County, Texas, cause no. 134055601010, for which he was sentenced to life imprisonment without the possibility of parole. Mayreis was charged by indictment with the offense of capital murder on May 17, 2012, with the Indictment alleging that Mayreis unlawfully, intentionally and knowingly caused the death of Azariah Mayreis, an individual under ten years of age, by striking her with his hand, striking her with an unknown object, having her head strike an unknown object, or by manner and means unknown. Mayreis pled not guilty and proceeded to trial. On August 8, 2014, a jury found Mayreis guilty, and, based on the State's decision not to pursue the death penalty, he was sentenced to life imprisonment without the possibility of parole.

Mayreis appealed his conviction to Texas' Fourteenth Court of Appeals, which affirmed the conviction in a published opinion on March 24, 2015. *Mayreis v. State*, 462 S.W.3d 569 (Tex. App.– Houston [14th Dist.] 2015). Mayreis' petition for discretionary review was thereafter denied on June 24, 2015. On August 22, 2016, Mayreis filed a state application for writ of habeas corpus. That application was denied by the Texas Court of Criminal Appeals without written order on November 15, 2017, on the findings of the trial court without a hearing.[1] This § 2254 proceeding,

---

[1] On June 7, 2017, the Texas Court of Criminal Appeals remanded Mayreis' state application for writ of habeas corpus to the state trial court for further consideration of Mayreis' claim that his trial counsel "rendered ineffective assistance because trial counsel did not invoke or preserve [Mayreis'] right to a public trial and an open courtroom." Upon remand, the state trial court ordered Mayreis' trial counsel to file an affidavit addressing that one claim of ineffectiveness. Following the filing of that affidavit, the state trial court entered findings of fact and conclusions of law, which the Texas Court of Criminal Appeals adopted when it denied Mayries' state application for writ of habeas corpus without written order on the findings of the state trial court without a hearing.

which was filed by Mayreis on or about December 4, 2017, followed.

## II.    Factual and Evidentiary Background

The factual and evidentiary background, summarized by the Texas Court of Appeals in its

published opinion affirming Mayreis' conviction, is as follows:

> The complainant A.M., born in January 2012, was the infant daughter of [ ]
> Shawn Mayreis. After her birth, A.M. left the hospital healthy, without any abnormal
> medical problems. A.M. remained healthy and developed normally. A.M.'s mother
> returned to work near the end of February 2012; [Mayreis] cared for A.M. during the
> day. On March 8, at around 4:00 p.m., A.M.'s mother received a phone call from
> [Mayreis], who reported that A.M. was not breathing. The mother instructed
> [Mayreis] to call 911. When the mother arrived home, [Mayreis] was on the phone
> with the 911 operator and performing adult cardiopulmonary resuscitation (CPR) on
> the child, who, according to the mother, looked blue. The paramedics arrived around
> 4:50 p.m. and were able to achieve a pulse, although A.M. was initially unresponsive.
>
> Medical personnel transported A.M. to Texas Children's Hospital in the
> Medical Center where she presented with small bruises on her face, abdomen, legs,
> and the middle of her back. In addition, the child had several large skull fractures,
> multiple fractures to her anterior and posterior ribs, and retinal hemorrhaging. A.M.
> was unable to breathe without medical support and was unresponsive to her physical
> exam. Her brain was dying and swollen. Three days later she was pronounced dead.
>
> [Mayreis] informed emergency responders and medical personnel that A.M.
> was fine in the morning, but began having difficulty breathing in the early afternoon.
> Medical personnel found [Mayreis's] explanation of A.M.'s injuries impossible and
> one of A.M.'s treating physicians found evidence that A.M. had been in dire need of
> medical treatment for hours before [Mayreis] called emergency services.
>
> Police arrested [Mayreis] and a grand jury indicted him for intentionally or
> knowingly causing death to a child under ten years of age. [Mayreis] pleaded "not
> guilty." At trial by jury, the child's mother testified along with several medical
> experts. The medical experts all testified that the extent and severity of A.M.'s
> injuries showed that they were intentionally inflicted. The jury found [Mayreis]
> guilty as charged and he was automatically sentenced to life in prison without the
> possibility of parole.

*Mayreis*, 462 S.W.3d at 571. In addition, in determining on appeal that the evidence was legally and

3

factually sufficient, the Texas Court of Appeals detailed that evidence as follows:

- A.M. had no abnormal medical problems prior to March 8.

- A.M.'s mother bathed A.M. in the evening on March 7 and did not notice any unusual bruises.

- A.M. was healthy when her mother left for work on the morning of March 8.

- A.M. was in the sole care of [Mayreis] on March 8 from the time the child's mother left for work until emergency responders were called to the scene. Although [Mayreis] left the apartment for a short time in the morning, [Mayreis] was the only person taking care of A.M. that day.

- Around 4:00 p.m. [Mayreis] called the child's mother and informed her A.M. was not breathing.  At the mother's direction, [Mayreis] called 911.

- The paramedics and emergency responders who answered [Mayreis'] 911 call noticed a striking difference between the mother's response to A.M.'s condition and [Mayreis'] response.  While the mother was hysterical, [Mayreis] appeared calm and unemotional.

- The paramedics noticed bruising around A.M.'s diaper line, above one eye, and on her stomach while they were transporting the infant to the hospital.

- A.M.'s autopsy revealed bruises, rib fractures, skull fractures, and extensive hemorrhaging. A.M. had bruises on her face, above her eyebrows, on her abdomen, on her legs, and in the middle of her back

- A.M. had several large skull fractures, including a crack that went all the way across her skull. These injuries created hemorrhaging that caused A.M.'s brain to swell. The swelling caused A.M. to lose oxygen and blood to the brain, resulting in irreversible brain damage and death.

- A.M.'s injuries were caused by significant blunt force trauma. A.M. suffered at least two violent blows, one above her right eye and one behind her right ear. A.M.'s parietal bone bent to accommodate the blows until it broke. Her parietal bone failed in multiple directions.

- A.M.'s head injuries were the result of significant force. The amount of force necessary to cause A.M.'s injuries is consistent with dropping a baby down a flight of stairs or from a greater height than the average height of a human being. None of A.M.'s head injuries could have been caused by trying to get her to wake up or respond.

4

- A.M. suffered extensive retinal hemorrhaging. Her retinas had detached to the back of her left eye in three areas and there were multiple hemorrhages in her right retina.

- The bridge under A.M.'s tongue was torn off. A treating physician testified that the tear likely resulted from the forceful introduction of an object, such as a bottle, into A.M.'s mouth.

- A.M. had twenty-two rib fractures, including fractures to her anterior and posterior ribs. The injuries to A.M.'s anterior ribs could have been caused by improper CPR, but the injuries to her posterior ribs were not typical of improper CPR. A.M.'s posterior rib fractures were consistent with holding an infant forcefully around the ribs and shaking her or hitting her head against something.

- A.M. suffered shearing injuries, which were consistent with suffering a violent trauma that caused her arms to flail.

- The forensic anthropologist testified that, by virtue of the number of injuries, it was unlikely A.M.'s injuries were caused by accidental trauma.

- A treating physician opined that A.M.'s injuries occurred at least an hour before medical treatment was sought. A.M. was pulseless and blue when paramedics arrived. It would have taken hours for A.M. to "decompensate" to that state. Also, A.M.'s blood-coagulation status suggested her injuries occurred hours earlier.

- The treating physician testified that A.M.'s condition was "unmistakably due to trauma." According to the physician, "the child's body has been battered and broken, but no history of trauma of any sort [was] provided." The physician testified that extreme violence was necessary to cause A.M.'s injuries and they were not all caused by one event. According to the physician, a person of reasonable intelligence familiar with children would know he was causing serious injuries to the baby that would cause the baby's death. The physician testified that the injuries were intentional.

*Id.* at 573-74. And, in rejecting Mayreis' arguments on appeal that there was no evidence, or insufficient evidence, that he caused the complainant's death, and did so intentionally or knowingly, the Court of Appeals further explained:

> [Mayreis] argues that there is no evidence that he caused A.M.'s death. He points to evidence that he was away from the apartment briefly in the morning and

argues that someone could have entered the apartment and harmed A.M. in his absence. He also argues that the evidence is insufficient to show that he caused A.M.'s death because nothing in his history, relationship with A.M., or response to her death suggested he caused her death.

While the evidence showed that [Mayreis] left the apartment for approximately six minutes on the day of A.M.'s death, in the version of events he told emergency responders, medical personnel, and his wife, A.M. was healthy until much later into the day. All of the medical experts testified that A.M.'s injuries were serious and would have been immediately apparent. Based on this evidence, a reasonable jury could have concluded that if an individual had entered the apartment during the short time [Mayreis] left A.M. alone and caused these injuries to A.M., [Mayreis] would have noticed A.M.'s injuries and would not have told his wife, emergency responders, and medical personnel that A.M. was fine until the afternoon. Furthermore, police responders searched the apartment and did not see any evidence of a break-in. Viewed in the light most favorable to the verdict, the evidence showed that an individual inflicted A.M.'s injuries while A.M. was in [Mayreis'] care. The child's mother testified that [Mayreis] stated he was the only one who cared for A.M. the day of the injuries. The evidence is sufficient to prove that [Mayreis] injured A.M. and that those injuries caused her death. . .

* * *

[Additionally,] [t]he testifying medical experts all concluded that A.M.'s injuries were intentionally inflicted. [Mayreis] told emergency responders and medical personnel that A.M. had trouble breathing, he attempted to get her to respond by hitting her head, and then performed CPR. But, A.M.'s severe injuries required more force than [Mayreis'] explanation allowed and many of her injuries were in locations that were not explained by the history [Mayreis] provided. The medical examiner, forensic anthropologist, and treating physician all found [Mayreis'] explanation of A.M.'s injuries impossible and testified that the injuries did not result from accidently administering improper CPR or attempting to get A.M. to respond. . . .

The medical examiner testified that an accident was unlikely because of the amount of force necessary to cause A.M.'s injuries. *See Herrera*, 367 S.W.3d at 770 (holding the severity of the injuries sustained by the infant constituted evidence of the appellant's intent). According to the medical examiner, the way A.M.'s skull fractured in multiple directions showed the fractures resulted from at least two blunt-trauma impacts from a significant force. The medical examiner testified that the amount of force necessary to cause A.M.'s skull fractures was inconsistent with the amount of force one would apply in administering improper CPR or attempting to get a baby to respond. The amount of force necessary to cause A.M.'s skull fractures was more consistent with the impact of hitting a baby violently or dropping a baby

6

down a flight of stairs. The forensic anthropologist testified that the sheer number of injuries A.M. sustained suggested the injuries were intentionally inflicted. In addition to bruising, shearing injuries, and a torn tongue, A.M. had twenty-two broken ribs. The medical experts testified that some of A.M.'s anterior ribs may have broken during improperly-administered CPR, but her posterior ribs would not have broken that way.

The medical examiner testified that after the injuries occurred it would have been immediately apparent that A.M. needed medical care. Yet, according to a treating physician, A.M. was injured for hours before [Mayreis] sought help. Based on this testimony, the jury could have concluded that [Mayreis'] delay in seeking medical care constituted evidence that he knowingly or intentionally caused A.M.'s death. A rational jury could have concluded from the number and nature of the injuries A.M. suffered that the child's injuries were not the result of an accident and [Mayreis'] implausible explanation for the injuries is circumstantial evidence that he inflicted the injuries with the intent or knowledge that they would cause A.M.'s death. *See Bearnth*, 361 S.W.3d at 140 (holding that appellant's inaccurate explanation of injuries was circumstantial evidence of guilt). Based on testimony from the medical examiner, anthropologist, and treating physician that A.M.'s injuries resulted from violent and intentional action, the jury could have concluded that A.M. could not have suffered those injuries unless [Mayreis] inflicted them knowingly or intentionally.

*Id.* at 574-75. It is within the context of this evidence that Mayreis' claims must be considered.

III. **Claims**

Mayreis raises claims of ineffective assistance of trial counsel and ineffective assistance of

appellate counsel, alleging that:

1. his trial counsel, R.P. "Skip" Cornelius, was ineffective for: (a) failing to ensure that his trial was a public trial; (b) failing to object to the admission of his pre-*Miranda* statements; (c) failing to object to the prosecutor's misstatement of the facts during closing argument; (d) failing to seek a mistrial on the basis of the prosecution's comment on his post-arrest silence and the violation thereby of his Fifth Amendment right against self-incrimination; and (e) failing to seek an instruction on the lesser included offense of negligent homicide; and

2. that his appellate counsel, Kurt B. Wentz, was ineffective for not challenging trial counsel's and/or the trial court's failure to allow Mayreis to allocute prior to sentencing.

7

Respondent argues in the Motion for Summary Judgment that Mayreis' claims were all considered and rejected by the Texas Court of Criminal Appeals in connection with the denial of his state application for writ of habeas corpus, and that that adjudication of his claims was not contrary to or based on an unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Consequently, Respondent maintains that summary judgment is warranted on all of Mayreis' claims under 28 U.S.C. § 2254(d).

## IV.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim presented in a federal habeas corpus proceeding has already been adjudicated on the merits in a state proceeding, federal review is limited. 28 U.S.C. § 2254(d) provides:

> (d)  An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"For purposes of 28 U.S.C. § 2254(d)(1), clearly established law as determined by [the Supreme] Court 'refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision.'" *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quoting

*Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

"[A] decision by a state court is 'contrary to' [the United States Supreme Court's] clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent.'" *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams*, 529 U.S. at 405-406). A state court decision involves an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "State-court decisions are measured against [the Supreme Court's] precedents as of 'the time the state court renders its decision.'" *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)). Similarly, state court decisions are reviewed under § 2254(d) by reference to the facts that were before the state court at the time. *Id.* ("It would be strange to ask federal courts to analyze whether a state court adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court.").

For factual issues, "the AEDPA precludes federal habeas relief unless the state court's decision on the merits was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" 28 U.S.C. § 2254(d)(2) (2000). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, factual determinations made by state courts carry a presumption of correctness and federal courts on habeas review are bound by them unless there is clear and convincing evidence to the

contrary. 28 U.S.C. § 2254(e)(1) (2000). *Smith v. Cockrell*, 311 F.3d 661, 667 (5th Cir. 2002), *cert. dism'd*, 541 U.S. 913 (2004).

Under § 2254(d), once a federal constitutional claim has been adjudicated by a state court, a federal court cannot conduct an independent review of that claim in a federal habeas corpus proceeding. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Rather, it is for the federal court only to determine whether the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, and whether the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Woodford*, 537 U.S. at 27 ("The federal habeas scheme leaves primary responsibility with the state courts for these judgments and authorizes federal-court intervention only when a state-court decision is objectively unreasonable."). This is true regardless of whether the state court rejected the claims summarily, or with a reasoned analysis. *Cullen*, 563 U.S. at 187 ("Section 2254(d) applies even where there has been a summary denial."). Where a claim has been adjudicated on the merits by the state courts, relief is available under § 2254(d) *only* in those situations "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Richter*, 562 U.S. at 102.

Whether a federal habeas court would have, or could have, reached a conclusion contrary to that reached by the state court on an issue is not determinative under § 2254(d). *Id.* ("even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable."). In addition, the correctness of the state court's decision is not determinative. As instructed by the Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 520 (2003), "[i]n order for a federal court to find

10

a state court's application of our precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. . . . The state court's application must have been 'objectively unreasonable.'" (citations omitted); *see also Price*, 538 U.S. at 641 ( "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.'") (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)). Moreover, it is the state court's ultimate decision that is to be reviewed for reasonableness, not its reasoning. *Neal v. Puckett*, 286 F.3d 230, 244-46 (5th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003); *Pondexter v. Dretke*, 346 F.3d 142, 148-9 (5th Cir. 2003), *cert. denied*, 541 U.S. 1045 (2004). A habeas petitioner can only overcome § 2254(d)'s bar "by showing that 'there was no reasonable basis'" for the state court's rejection of his claim(s). *Cullen*, 563 U.S. at 188 (quoting *Richter*, 562 U.S. at 98)).

## V.    Discussion – Ineffective Assistance of Trial Counsel Claims

The clearly established Federal Law applicable to claims of ineffective assistance of trial counsel is contained in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court determined that relief is available if a petitioner can show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Id.* at 687. Deficiency under *Strickland* is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id.* at 687-689. The prejudice element requires a petitioner to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

A petitioner has the burden to prove both the deficiency and the prejudice prongs in order to be entitled to relief. *United States v. Chavez*, 193 F.3d 375, 378 (5th Cir. 1999).

Under *Strickland*, judicial scrutiny of counsel's performance is highly deferential and a strong presumption is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992) (citing *Strickland*), *cert. denied*, 509 U.S. 921 (1993). In order to overcome the presumption of competency, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland*, a petitioner must be able to establish that absent his counsel's deficient performance the result of his trial would have been different, "and that counsel's errors were so serious that they rendered the proceedings unfair or the result unreliable." *Chavez*, 193 F.3d at 378; *Cullen*, 131 S.Ct. at 1403 ("[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result") (quoting *Strickland*, 466 U.S. at 686)). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in the light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied*, 467

U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland*, 466 U.S. at 690-691. Counsel will not be judged ineffective only by hindsight. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 124 S.Ct. 1, 6 (2003).

When an ineffective assistance of counsel claim has been adjudicated on the merits by the state courts, federal habeas review is "doubly deferential," with the court taking a "highly deferential look at counsel's performance" under *Strickland*, and then imposing a second layer of deference under § 2254(d). *Cullen*, 131 S.Ct. at 1403. Under § 2254(d), therefore, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Richter*, 131 S.Ct. at 788. As for *Strickland's* prejudice prong, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 131 S.Ct. at 791. Instead, the question is whether "fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents. *Id.* at 786. If "'fairminded jurists could disagree' on the correctness of the state court's decision," § 2254(d)(1) precludes relief. *Id.* at 786. In contrast, where there is no "possibility that fairminded jurists could disagree" and fairminded jurists would uniformly conclude that the state court's decision is contrary to, or based on an unreasonable application of clearly established Federal law, relief is available under § 2254(d)(1). *Id.*

For the reasons that follow, Mayreis' ineffective assistance of trial counsel claims all fail under this doubly deferential standard of review under § 2254(d).

A.    **Public Trial**

In his first claim, Mayreis complains about counsel's failure to ensure that his trial was public. In support of that claim, Mayreis alleges that counsel told members of his family that they could not attend voir dire because there would be no room for them. The Texas Court of Criminal Appeals rejected this claim on the merits after determining that the contents of counsel's affidavit, which was submitted in the state habeas proceeding, were true. In that affidavit, Mayreis' trial counsel, R.P. "Skip" Cornelius, stated that he "was not aware that a defendant's family had an absolute right to watch jury selection and that the trial court had a duty to make certain that there was seating for the family in the courtroom even if it meant dividing the jury panel and being forced to conduct two jury selections," and that it was clearly his "fault that they did not get to see the jury selection." (Document No. 11-16 at 14). Cornelius also stated in that affidavit that he "would have done nothing differently during jury selection if his family had been present" and that it would be "very difficult to convince me he was harmed by his family not being present during jury selection." (Document No. 11-16 at 15).

The Texas Court of Criminal Appeals' rejection of this ineffectiveness claim is not contrary to, or based on, an unreasonable application of clearly established Federal law, and is not based on an unreasonable determination of the facts in light of the evidence. Cornelius admitted in his affidavit that he told Mayreis and Mayreis' family that there would be no room for Mayreis' family members to attend the voir dire proceeding(s), and admitted, as well, that he made no effort to ask the state court judge to make room for Mayreis' family members during voir dire. That Cornelius should have asked the state trial court to make room for Mayreis' family members does not appear to be disputed. *See Presley v. Georgia*, 558 U.S. 209, 212-13 (2010) (subject to some exceptions,

"the Sixth Amendment right to a public trial extends to the *voir dire* of prospective jurors"). As for

whether Cornelius' failure to ask the state trial court to accommodate Mayreis' family members

during voir dire affected the outcome of the trial or rendered Mayreis' trial fundamentally unfair, *see*

*Weaver v. Massachusetts*, 137 S.Ct. 1899, 1911 (2017) ("when a defendant raises a public-trial

violation via an ineffective-assistance-of-counsel claim. . . the burden is on the defendant to show

either a reasonable probability of a different outcome in his or her case or [ ] to show that the

particular public-trial violation was so serious as to render his or her trial fundamentally unfair."),

the Texas Court of Criminal Appeals' conclusion that it did not is supported by the record and is not

contrary to, or based on, an unreasonable application of federal law. *See* State Trial Court's Findings

of Fact and Conclusions of Law (Document No. 11-16 at 25) ("[Mayreis] has not shown that there

is a reasonable probability that he would not have been convicted but for counsel informing

[Mayreis'] family members that there would not be sufficient room for them for them to be present

during jury selection. . . . [Mayreis] has not shown that [Mayreis'] trial was fundamentally unfair

because [Mayreis'] family was not present during jury selection due to counsel's advice.").

Cornelius stated in his affidavit that

> . . . I would have done nothing differently during jury selection if his family had been
> present and I know the jury selection process was recorded and is a part of the record
> and has been studied for potential errors. What the record will not show however,
> is that I involve my clients with the jury selection process and I certainly involved
> Mr. Mayreis in his jury selection. He had his own jury chart and he was instructed
> how I wanted him to code the jurors in terms of how we regarded them. He
> participated with me in deciding every single strike. If we had a difference of
> opinion regarding a juror, once I gave him all my reasons to keep or strike the juror,
> whatever he decided was what we did. It would be very difficult to convince me he
> was harmed by his family not being present during jury selection.

(Document No. 11-16 at 15). Nothing in the record suggests that Cornelius' assessment was

unreasonable or wrong. In particular, there is nothing in the record to indicate that the presence of

Mayreis' family members at voir dire would have affected the outcome of the trial. Mayreis' family members were present during the guilt-innocence stage of the trial, but not during voir dire. Other than argue that his right to a "public" trial was compromised by Cornelius' incorrect advice, Mayreis points to no evidence, and raises no viable argument, that Cornelius' incorrect advice about there being "room" for Mayreis' family members during voir dire affected the outcome of Mayreis' trial or rendered his trial fundamentally unfair. Therefore, because the record supports the Texas Court of Criminal Appeals' rejection of this ineffectiveness claim, no relief is available to Mayreis on this ineffectiveness claim under § 2254(d).

### B.     Pre-*Miranda* Statements

In his next claim, Mayreis contends that Cornelius was ineffective for failing to object to and exclude statements he made to police prior to being advised of his rights under *Miranda*. According to Mayreis, the statements he made to Officers Vinogradov and Fontenot were both made while he was in "temporary" custody, and were made prior to being given his *Miranda* warnings. Mayreis particularly complains about the statements he made to Officer Fontenot, arguing that Officer Fontenot's conduct was a deliberate attempt to undermine *Miranda*. Respondent responds to this claim in the Motion for Summary Judgment, arguing that Mayreis was not "in custody" at the time he made statements to Officer Vinogradov and Officer Fontenot.

"[T]he Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). "'Custodial interrogation' is 'questioning initiated by law enforcement officers after a person has been taken into custody.'" *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "A person is 'in custody' for *Miranda* purposes when placed under formal arrest."

*United States v. Lim*, 897 F.3d 673, 690 (5th Cir. 2018).

Here, Mayreis was not "in custody," meaning, was not placed under formal arrest, at the time he made statements to Officers Vinogradov and Fontenot. The record shows that Officer Vinogradov spoke with Mayreis when he arrived as part of the response to a medical emergency call. When asked at trial if he had spoken to Mayreis at the scene, Officer Vinogradov testified about that encounter as follows:

Q:      . . . . Did you talk to the Defendant at the scene, at the apartment?

A:      Briefly.

Q:      And what did you ask him?

A:      I had asked him what happened with the baby.

Q:      And what did he say?

A:      He said that he had been watching her that day when Ms. Mayreis went to work at My Fit Foods; and in the afternoon she was having difficulty breathing and so he picked her up to burp her.

        After burping her, he put her down and gave her a milk bottle that he propped up with a blanket. He said that the baby could feed herself – at two months – and so he left the room for about five to ten minutes and came back and Azariah was not breathing; and so he picked her up and repeatedly slapped her on the back of the head and on her back to see if he could get a response from the baby.

(Document No. 11-22 at 122-23). Nothing in the record indicates or suggests that Mayreis was in custody, or even under suspicion, at the time he made statements to Officer Vinogradov. As such, counsel had no basis to challenge, on Fifth Amendment incrimination grounds, the admission of the statement(s) Mayreis made to Officer Vinogradov.

As for Mayreis' complaint about an alleged two step interrogation technique employed by Officer Fontenot, nothing in the record supports the conclusion that Officer Fontenot used an

17

interrogation technique that was calculated "to undermine the *Miranda* warning," as was the case in *Missouri v. Seibert*, 542 U.S. 600, 622 (2004)).  In *Seibert*, the Supreme Court addressed a situation where police officers used a deliberate two-step interrogation process to both undermine the *Miranda* warnings that were given, and secure a confession.  In that case, Seibert was arrested and taken to the police station, where a conscious and deliberate decision was made not to give her *Miranda* warnings.  Questioning ensued, which resulted in Seibert making incriminating statements to the questioning officer.  Seibert was then given a break from questioning.  Following a twenty minute break, Seibert was given her *Miranda* warnings and was then questioned anew, with the questioning officer making reference, several times, to the incriminating, pre-*Miranda* statements Seibert had already made, prompting Seibert to make additional, post-*Miranda* incriminating statements.  Finding the deliberate process to undermine the *Miranda* warning as "challenging the comprehensibility and efficacy of the Miranda warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she [Seibert] retained a choice about continuing to talk," the Supreme Court concluded that the postwarning statements were inadmissible.  *Seibert*, 542 U.S. at 617.

Here, nothing about Officer Fontenot's interaction with Mayreis calls into play the circumstances at issue in *Seibert*.  The record shows that Officer Fontenot was called to the scene on October 8, to investigate possible child abuse.  As part of that investigation, he spoke with Mayreis, who was not in custody and had not been arrested.  Mayreis appeared willing to cooperate with the investigation, and gave Officer Fontenot a "walk-through" statement about what had happened that day.  Fontenot testified about that statement, which was recorded, as follows:

> Q:    And now, when you are taking the photos are you also going to try to get a statement from the Defendant?

A:      Yes, ma'am.

Q:      Are you going to record that statement?

A:      Yes, ma'am.

Q:      Why are you going to record it?

A:      So, that everybody that listens to it later knows that that really happened. If I were just to write something down, there's no – can't say that I lied or tried to make something up. Everything is pretty much out in the open and recorded.

Q:      How would you describe what a walk-through statement is?

A:      The way I would describe it is, in this case, we asked Mr. Mayreis to walk us through what had happened. What was going on that day and looking for how the injuries occurred to the baby.

Q:      And did he participate in that?

A:      He did.

Q:      And did you and Officer Arocha take a statement from him and videotape him?

A:      Yes, ma'am.

(Document No. 11-22 at 157-58). Following that statement, Officer Fontenot and his partner left Mayreis at his apartment. He was not arrested until several days later.

Because the record shows that Mayreis was not "in custody" at the time Officer Fontenot took the walk-through statement from him, and because Mayreis has not pointed to anything in the record that would indicate that Officer Fontenot attempted to, or did, undermine *Miranda*, Mayreis has not shown that counsel was ineffective for failing to object to the admission of his voluntary statements to Officer Fontenot. As the Texas Court of Criminal Appeals' rejection of this ineffectiveness claim is supported by the record, no relief is available to Mayreis on this ineffectiveness claim under § 2254(d).

19

## C.    Prosecutor's Closing Argument

In his next claim, Mayreis complains that counsel should have objected to the prosecutor's

misstatements of the evidence during closing argument. Mayreis points to the prosecutor's closing

argument at page 48 of volume 6, which he claims is inconsistent with an expert's (Jason Wiersema)

testimony that he did not known how or when the injuries occurred.

That part of the prosecutor's closing argument identified by Mayreis as objectionable in his

§ 2254 application is as follows:

> So, of course, the – if we had brought DNA in here saying Azariah's was on
> the table, what would you be saying?  Well, she lives there.  That means nothing.
> That's not evidence.
>
> Why would you – he didn't get in a fistfight with his own two-month-old
> infant, so why would he have all these injuries on his hands.  It is not like he fought
> her.

(Document No. 11-22).  But aside from identifying the argument that he believes was objectionable,

Mayreis has not identified, by reference to any legal authority, why that argument was objectionable.

He has also made no showing that an objection by counsel, if it had been made, would have been

sustained.  In the absence of a showing that counsel's performance in this regard was deficient, and

that it prejudiced Mayreis, the Texas Court of Criminal Appeals' rejection of this claim is not

contrary to, or based on an unreasonable application of Strickland.  Consequently, under § 2254(d),

no relief is available to Mayreis on this ineffectiveness claim.

## D.    Self Incrimination

Mayreis next claims that Cornelius was ineffective for failing to object, on Fifth Amendment

self-incrimination grounds, to the prosecution's question of Officer Fontenot about whether Mayreis

had made a statement after his arrest.  Mayreis maintains that the prosecutor's question, and Officer

Fontenot's answer, constituted a comment on his post-arrest silence, in violation of his Fifth Amendment right against self-incrimination.

Mayreis' ineffectiveness claim is belied by the record. While Officer Fontenot did testify that Mayreis did not provide a statement to police after his arrest, the record shows that counsel objected to that testimony. The record further shows that the trial court sustained counsel's objection and instructed the jury to disregard the prosecutor's question(s) and Officer Fontenot' answers. Mayreis' counsel then pursued his objection further, asking for a mistrial, which the trial court denied. (Document No. 11-22 at 178-79). As for the follow-up questions posed by the prosecutor to Officer Fontenot about whether Mayreis had cooperated with the investigation after his statement to Officer Fontenot on March 8, counsel again objected to that line of questioning and, outside the presence of the jury, made it clear to the trial court his concerns about the prosecutor's questions. While the trial court overruled counsel's objections, it instructed the prosecutor not to ask about Mayreis' lack of cooperation after his arrest. (Document No. 11-22 at 428-431). Upon this record, where counsel did object to any testimony or suggestion of Mayreis' post-arrest silence, Mayreis has not, and cannot show that the Texas Court of Criminal Appeals' rejection of this claim was contrary to or based on an unreasonable application of *Strickland*. Accordingly, under § 2254(d), no relief is available on this ineffectiveness claim.

### E.    Lesser Included Offense Instruction

In his final ineffective assistance of trial counsel claim, Mayreis complains about counsel's failure to request, and secure, a jury instruction on the lesser included offense of negligent homicide. According to Mayreis, such a lesser included offense instruction was warranted because the jury should have been able to consider whether the complainant's death was a result of his "negligent"

21

"neglect."

Here, as argued by Respondent, this ineffectiveness claim is completely refuted by the record. The jury instructions did include several lesser included offenses of capital murder, including criminally negligent homicide (Document No. 9-9 at 6-25). Given those instructions, the Texas Court of Criminal Appeals' rejection of this ineffectiveness claim is undisputably not contrary to or based on an unreasonable application of *Strickland,* and no relief is available on this ineffectiveness claim under § 2254(d).

## VI.    Discussion – Ineffective Assistance of Appellate Counsel Claims

Claims of ineffective assistance of appellate counsel are generally assessed under the same two part *Strickland* deficiency and prejudice standard as claims of ineffective assistance of trial counsel. *Williams v. Collins*, 16 F.3d 626, 635 (5th Cir.), *cert. denied*, 512 U.S. 1289 (1994). With respect to *Strickland's* deficiency prong, however, "[o]n appeal, effective assistance of counsel does not mean counsel who will raise every nonfrivolous ground of appeal available." *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998), *cert. denied*, 525 U.S. 1174 (1999); *see also Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir.) ("The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal."), *cert. denied*, 493 U.S. 970 (1989). Rather, "[a]ppellate counsel is obligated to only raise and brief those issues that are believed to have the best chance of success." *Rose*, 141 F.Supp.2d at 704-705. "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985) (cited with approval in *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). As for *Strickland's* prejudice prong, "[p]rejudice results if the attorney's deficient

performance would likely render either the defendant's trial fundamentally unfair or the conviction and sentence unreliable." *United States v. Dovalina*, 262 F.3d 472, 474 (5th Cir. 2001).

In his one claim of ineffective assistance of appellate counsel, Mayreis complains about appellate counsel's failure to include a challenge on appeal to the failure of either his trial counsel or the state trial court to provide him an opportunity to allocute prior to sentencing. Mayreis contends that his inability to allocute prior to sentencing was clear error that should have been raised on appeal.

Mayreis was charged with capital murder. Because the State elected not to seek the death penalty, Mayreis was automatically sentenced, upon the jury's finding that he was guilty of capital murder, to life imprisonment without the possibility of parole. *See* TEX. PENAL CODE § 12.31(a) ("An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for: (2) life without parole, if the individual committed the offense when 18 years of age or older."). Thus, there was no sentencing discretion, no sentencing proceeding, and no platform for Mayreis to allocute. Moreover, "'a criminal defendant in a capital case does not possess a constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination.'" *Burton v. Thaler*, 863 F.Supp.2d 639, 658-59 (S.D. Tex. 2012) (quoting *United States v. Hall*, 152 F.3d 381, 396 (5th Cir.1998), *abrogated on other grounds by United States v. Martinez–Salazar*, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000)). Under these circumstances, it cannot be said that counsel was ineffective at trial, or ineffective on appeal, for failing to raise the allocution issue. Consequently, the Texas Court of Criminal Appeals' rejection of this claim is not contrary to or based on an unreasonable application of clearly established federal law, and § 2254(d) precludes any

23

relief on this claim.

## VI.    Conclusion and Recommendation

Based on the foregoing and the conclusion that no relief is available to Mayreis on the merits of his claims under § 2254(d), the Magistrate Judge RECOMMENDS that Respondent's Motion for Summary Judgment (Document No. 12) be GRANTED, that Petitioner's Application for Writ of Habeas Corpus (Document No. 1) be DENIED and that this § 2254 proceeding be DISMISSED WITH PREJUDICE on the merits.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140, 144-145 (1985); *Ware v. King*, 694 F.2d 89, 91 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404, 408 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 2⌀ day of November, 2018.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

24